# BROOKS RESOURCES CORPORATION *v.*
## DEPARTMENT OF REVENUE

James V. Hurley and Neil R. Bryant, Gray, Fancher, Holmes & Hurley, Bend, represented plaintiff.

Alfred B. Thomas, Assistant Attorney General, Salem, represented defendant.

Decision for plaintiff and remand to defendant for amended order, November 18, 1975.

CARLISLE B. ROBERTS, Judge.

Plaintiff is an Oregon corporation which deals in real estate, property development, and property management. It is the developer of three subdivisions comprising planned unit developments in Deschutes County, known as Black Butte Ranch (located eight miles northwest of Sisters, Oregon), Ponderosa Pines (located 20 miles south of Bend, Oregon), and Tollgate (located two miles northwest of Sisters). Each has been designated a "planned unit development" by the plaintiff.

Each planned unit development contains its own domestic central water system and, in the case of Black Butte Ranch (and perhaps in the others), the system is particularly designed to meet Fire Underwriters and municipal standards. Each system is adequate only for the specific development.

The Utility Section of the Assessment and Appraisal Division of the Department of Revenue, following long-established procedures which it deemed to be required by ORS 308.515(1)(a) and (1)(b), sought to determine the true cash value of the water services of each of the three planned unit developments as of January 1, 1974. Although each system varies from the others in size and capacity, the principal physical elements are the same: a well or wells,

pump house, a pump with electrical controls and valving, a pressure tank, long lines of pipe of various diameters, hydrants, services to building lots, and, in the case of Black Butte Ranch, a standby diesel engine.

The defendant's three original assessments for the water systems as of January 1, 1974, were the subject of appeals by the plaintiff to the defendant pursuant to ORS 308.595(2). Plaintiff pleaded that the value of each water system was either nominal or zero, citing *Tualatin Development v. Dept. of Rev.*, 256 Or 323, 473 P2d 660 (1970). A hearing on each petition was held by the Department of Revenue on June 24, 1974, and the original assessments were increased by three orders dated July 17, 1974, as follows: No. A&AU-74-59, Black Butte Ranch water system, from $552,000 to $736,000; No. A&AU-74-60, Ponderosa Pines water system, from $60,800 to $76,000; and No. A&AU-74-61, Tollgate water system, $104,000 to $130,-000. The increase by the Department of Revenue was made on recommendation of the defendant's appraisal engineer, Robert E. Graf, who had appraised each of the systems as of January 1, 1974.[1] However, in a separate trial,[2] the defendant conceded that its notices to plaintiff respecting the January 1, 1974, values, mailed pursuant to ORS 308.595(2), were void for failure to provide the statutory six days' notice to plaintiff to appear (see ORS 308.595(1)), leaving the defendant able to defend only the amount of its original appraisals.

---

[1] Mr. Graf testified that in his original appraisals he had discounted his findings of value by 20 percent, more or less, because of the lack of earnings in each of the three systems. Subsequently, convinced that the systems were purposely operated with the intent that no income be produced, he eliminated the discount, relying solely on a historical cost approach to value, less depreciation.

[2] *Brooks Resources Corporation v. Dept. of Rev.*, TC No. 899, decided April 21, 1975.

At the trial in this court, it was first revealed that an error in plaintiff's annual statement (filed pursuant to ORS 308.520 and 308.525), relied upon by the defendant, had resulted in an excess cost being reported for the water system at Black Butte Ranch, in that an expense attributable by the plaintiff solely to the water system was actually due in part to the cost of trench installation of electrical and telephone lines. Counsel stipulated during the trial that this required the reduction of the original appraisal of the Black Butte Ranch system from $552,000 to $480,000.

Plaintiff contended that the values of each of the water systems (and all other common interests) were assessable to the platted lots located in each development, respectively, and that the water systems had no independent value; that the assessed values of the lots, as appraised by the county assessor, actually included the values of the water systems, resulting in double taxation of such values; that the value of each water system is only nominal or zero because the systems have operated at a loss since inception, that economic projections show their incapability of generating income, but the plaintiff is estopped from removing the systems or from charging profitable rates or using a system outside of the development for which it is planned. (Plaintiff also pleaded discrimination in the use of the approach to value, because of the use of historic cost less depreciation, alleging violation of the U.S. Constitution, Fourteenth Amendment, and the Oregon Constitution, Art I, § 20, but presented no evidence or argument in support of the allegation and it is deemed by the court to have been withdrawn.)

The defendant's brief asserts that three issues have been presented to the court: (1) whether the defendant has jurisdiction to appraise the respective water systems pursuant to ORS 308.505 *et seq.*, re-

lating to the assessment of designated utilities and companies by the Department of Revenue; (2) whether there has been a double assessment of the respective water systems; and (3) what was the true cash value (as defined in ORS 308.205) of the individual water systems on the assessment date.

The court finds: (1) that the three planned unit developments, severally, including the water systems, should have been wholly appraised and assessed by the county assessor in the first instance; and (2) that the possibility of double assessment of the water systems has been indicated but not resolved. The county assessor must appraise all elements of a particular planned unit development; *i.e.*, the units within or to be included in a condominium,[9] the separate units, the general common elements and the limited common elements. (No testimony has revealed the existence of this last class among the three developments.) (If, at an early stage of development, a cost approach to value is required, it appears to the court that, for appraisal purposes, the values of the common elements must initially be attributed to the planned units in accordance with some reasonable formula; *e.g.*, in proportion to the sales price of the unit over the total sales prices of all the units. Compare ORS 91.-610.) The court's reasoning follows.

First, as to the defendant's jurisdiction to tax, defendant's reliance is placed upon ORS 308.505 *et seq.*, relating to assessment of designated utilities and companies by the Department of Revenue. ORS 308.-515 provides that the department shall make an annual assessment upon any property used by any company in performing or maintaining "the following businesses or services or in selling any of the following

---

[9] The plans for Black Butte Ranch contemplate a number of multi-unit condominiums.

commodities, * * * [including] water; * * *." A witness for the defendant testified that the state agency had been appraising and assessing water companies, with few exceptions, under ORS 308.505 *et seq.,* and its predecessors, since 1907, certifying to the assessor of each county in which the property of any company is found the values to be taxed by such county, pursuant to ORS 308.635(2).

█ The taxation of water systems under ORS 308.505 *et seq.,* has been affected by Or Laws 1963, ch 541, in which the Legislative Assembly approved the Unit Ownership Law codified in ORS 91.505 to 91.675, implicitly repealing the department's duty to appraise certain water systems coming within the purview of the 1963 statute. *See Ron Jones & Co. et al v. Dept. of Rev.,* 5 OTR 495 (1974). This act creates a new pattern for the ownership and use of improved property in Oregon, providing for the planning and platting of property in the expectation that living units (in buildings designed for multiple housing or in separate buildings), will built by the purchaser or developer, to be held by the buyers in fee simple. The "unit owner" receives a "unit deed." ORS 91.565. The grantor and grantee may include therein such details as they consider desirable but it is not required that the deed list the general common elements provided for the use of all unit owners. Such common elements include "[i]nstallations of *central services* such as power, light, gas, *hot and cold water,* heating, refrigeration, air conditioning, waste disposal and incinerating; * * *." ORS 91.505(6). (Emphasis supplied.) Nevertheless, each unit owner is entitled to an undivided interest in the common elements in the percentage expressed in the declaration filed by the developer with the county. ORS 91.610.

The planned unit development is contemplated as a separate enclave, standing alone or among other subdivisions, to a large degree self-contained, with amenities and supports desired by the purchasers and ultimately managed by them to their own satisfaction. The planned development, consequently, although rigidly structured within itself, is permitted to offer plans with provisions as to lot sizes, road designs, open spaces, recreation areas and other amenities which differ substantially from the typical platted development. The agreements between the developers and the city or county, and other regulatory agencies (including federal agencies), placing continuing duties on the developer and its successors, also vary from what has been customary in the past.

Under the Unit Ownership Law, county officials, not state officials, are the administrators of the law. Declarations of planned unit ownership must be approved by the county assessor and the tax collector before recording. ORS 91.535(1). Each unit with its percentage of undivided interest in the common elements is considered a parcel of real property, subject to a separate assessment and taxation by the county officials as in the case of other real property. The county assessor is specifically designated as the responsible officer to appraise and determine the true cash value of a unit with its undivided interest in the common elements. ORS 91.640(1) and (2).

The Unit Ownership Law sets the pattern but it must be read in connection with ORS 92.044 which provides for the adoption of standards and procedures governing approval of plats and of partitioning of land by the governing body of a county or a city, by regulation or ordinance. Under ORS 92.044, a county may thus provide for and recognize unit ownership developments and make provision for the de-

veloper's requirements and responsibilities during the initial periods of construction of the project, even to temporary retention of legal title of common elements by the developer for security purposes, prior to the formation of a strong, responsible association of unit owners (denominated the Property Owners' Association in this suit).

The testimony herein indicates that the plaintiff is proceeding under a master plan filed with Deschutes County pursuant to the county's ordinances which permit the developer, initially, to hold title to the water systems. The court finds (as plaintiff's testimony has shown) that the subject property, although legally owned by plaintiff, has been developed and is being held solely for the benefit of the unit owners, who must be deemed the beneficial owners thereof.

The testimony shows and the court finds that the plaintiff is a property developer and has no interest in engaging in the type of water business contemplated in ORS 308.505 *et seq.* A water system is a significant factor in selling units in a planned unit development. In the three developments which are herein considered, the plaintiff undertook, in its representations to the county and to federal authorities (and eventually to unit buyers), in consideration of approval to create and market such developments, to install and operate a water system until it could be administered by the Property Owners' Association (a stage not yet reached in these developments, each of which is far from completion). Conscious of its contractual responsibilities, the plaintiff presently maintains and operates the systems, although it would willingly give them away if assured its contractual responsibilities would be properly carried out. Eventually, title will be vested in the Property Owners' Association.

The court, under the present statutes cited above, finds no difficulty in holding that all the values in the common elements, including the water systems, are subject to the assessor's appraisal and taxable to the unit owners (including the plaintiff as owner of unsold lots). Unfortunately, at the trial, specific testimony as to the planned unit development ordinances and the contracts between developer and purchaser were not offered in evidence and the court lacks the information to prescribe a specific formula of attribution.

The testimony produced in court was also insufficient to settle the issue of double taxation.

The plaintiff maintains that in setting the sales price, it included the value of all the common elements.[4] There was an assertion that, as a unit lot was sold, it was placed on the assessment roll by the county assessor at the plaintiff's sales price. But, in seeming contradiction to this testimony, it also appears that the assessor accepted the values for the water systems certified to him by defendant pursuant to ORS 308.635(2) and extended those values on the roll. It must be assumed that the assessor would not participate knowingly in any action which would lead to double taxation of specific property. ORS 41.360 (15). However, the county assessor was not called as a witness in this suit by either party and the facts

---

[4] Plaintiff's witness testified as to the developer's determination of the sales price of a unit lot as follows:

Q "* * * How does your company determine the costs of a lot in any one of these three subdivisions?"

A "We total the development costs. By development costs—this is approximate now. We total the development costs, which include land, engineering, amenities, sewer, water, golf, swimming pools, open space ground and roughly double that, to determine the sales price. Costs are determined by the total costs divided by the number of units within each subdivision."

necessary to a determination by the court of the actuality of double taxation are not present in the record, although there is a strong inference of the possibility.

In this state of the facts, it is necessary for the court to remand to the defendant the questions of the assessable true cash values of the units and of the dependent properties represented by the water systems for determination and computation, with the instruction that a further hearing be afforded the plaintiff upon the facts discovered by defendant, to be followed by the issuance of an amended order (unless the parties stipulate to such values), pursuant to ORS 305.425(3).[9]

There can be no serious contention that the water systems have only a nominal or zero value. If the plaintiff, as developer, were to sell all its present right, title and interest in a subdivision to a willing buyer as of January 1, 1974, unquestionably the water systems would be regarded by the parties as an important and valuable aspect of the bargain. There can be no doubt, also, that the purchasers of unit lots then and now consider their supply of water for domestic purposes, irrigation and fire protection as essential and valuable.

In making its determination, the defendant must, of necessity, require the aid of the county assessor and seek to determine the true cash value of all the land in each planned unit development as of January 1, 1974, including all the units sold by plaintiff as of that date and those remaining unsold, to insure the inclusion of the value of all common elements, without duplication. The value of each system, standing

---

[9] The court having determined that the county assessor was responsible to appraise the subject property, the remand is based on ORS 305.425(3), rather than ORS 308.620.

alone, has been determined adequately by the witness, Mr. Graf.[©] But the main question is not the value of the water systems but where, how and to whom their values shall be attributed, questions similar to those in the transfer or acceptance of important easements between servient and dominant tenancies. *See Tualatin Development, supra,* and cases cited therein, and *Supervisor of Assess. v. Bay Ridge,* 270 Md 216, 310 A2d 773 (1973).

The unanswered issues are remanded to the defendant pursuant to ORS 305.425(3) with the requirement that defendant prepare an amended order (or orders) in keeping with the rulings of the court.

The court will withhold entry of its decree pending the filing with it by defendant of defendant's amended order. Plaintiff should be given opportunity for hearing on a proposed amended order before it is made final by the defendant. If the parties cannot agree on the order, such further proceedings shall be held in this court as the court deems necessary.

No costs to either party.

---

[©] The plaintiff has now had notice of Mr. Graf's findings and will have further opportunity to contest such findings. Consequently, the department's past failure to give proper time to plaintiff in which to protest the values determined in Orders Nos. A&AU-74-59, 74-60, and 74-61 no longer precludes a full consideration of true cash value in this suit (including Mr. Graf's values, if such are found to be useful in defendant's reconsideration of value on remand).